# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

    Plaintiff,

v.

WYNN LAS VEGAS, LLC,

    Defendant.

Case No. 2:16-cv-02187-RFB-PAL

**ORDER**

## I. INTRODUCTION

Before this Court are Defendant Wynn Las Vegas ("Defendant")'s Motion for Summary Judgment (ECF No. 26) and Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC" or "Plaintiff")'s Partial Motion for Summary Judgment (ECF No. 27). For the reasons stated below, both Motions are denied.

## II. BACKGROUND

On September 16, 2016, Plaintiff filed its Complaint with Jury Demand against Defendant. (ECF No. 1). Plaintiff asserts the following causes of action: (1) failure to provide a reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"); (2) failure to engage in the interactive process in violation of the ADA; and (3) retaliation in violation of the ADA. Defendant filed its Answer on November 14, 2016. (ECF No. 5).

The parties filed their respective Motions for Summary Judgment on September 22, 2017. (ECF Nos. 26, 27). Responses were filed on October 27, 2017. (ECF Nos. 28, 29). Plaintiff filed an Errata to its Response on November 8, 2017. (ECF No. 30). On November 9, 2017, Defendant

filed its Reply. (ECF No. 31). On November 10, 2017, Plaintiff filed its Reply. (ECF No. 32). The Court held a hearing on the matter on July 9, 2018, and took the matter under submission.

### III. LEGAL STANDARD

#### A. Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (quotation marks omitted).

### IV. FACTUAL FINDINGS

#### A. Undisputed Facts

The Court finds that the following facts are undisputed. Plaintiff brings this suit on behalf of Soloman Hussey ("Hussey"), a United States Army veteran who served in the Iraq War. Hussey is a former employee of Defendant. Hussey was diagnosed with Post Traumatic Stress Disorder ("PTSD") after his military service. He first received treatment by the United States Department of Veterans Affairs Southern Nevada Healthcare System ("VA") in December 2008.

Defendant is a major casino resort in Las Vegas, Nevada. Defendant hired Hussey in February 2007 as a full-time security officer. At the time of his employment, Hussey received a Job Summary for his security officer position and signed it, representing to Defendant that he was capable of performing the position's essential functions. Later in 2007, Hussey became a bike

security officer. The bike security officer position is different from a regular security officer in that a bike security officer receives additional training on riding and maneuvering a bike, and is required to patrol the exterior of Defendant's resort property. The training for this position is two or three days long. As a bike officer, Hussey was responsible for patrolling and monitoring his assigned areas to provide a safe environment for Defendant's guests and employees. Hussey's job involved responding to emergency situations as needed. As a bike security officer, Hussey was required to be physically present at work, inasmuch as he could not perform any of his job duties if he was absent from work.

Hussey performed his job as a bike security officer for Defendant without incident throughout 2007, 2008, 2009 and the first half of 2010. During his employment, he performed satisfactorily and was never counseled or disciplined for any attendance or performance problems. Hussey never shared his PTSD diagnosis with any management official at Defendant until the summer of 2010. That summer, Hussey started experiencing problems with the medication he was taking for his PTSD. As a result, Hussey spoke with his then-Shift Manager, Tammy Rogers ("Rogers"), in early August 2010, telling her he had PTSD and informing her that he might need to take some leave. At that time, Hussey described his working relationship with Rogers as "real good." Rogers had never issued any disciplinary action to Hussey throughout his entire employment with Defendant. In response to Hussey's disclosure of his PTSD, Rogers advised him to fill out paperwork for Family and Medical Leave Act ("FMLA") leave so that leave would cover whatever he needed for his condition.

Defendant provided Hussey with FMLA medical certification forms on August 3, 2010 to be completed by his health care provider and returned by August 18, 2010. Hussey gave the forms to Mildred L. Martin, RN ("Nurse Martin"), a nurse practitioner at the VA who was then treating Hussey for his PTSD. At that time, Nurse Martin did not complete the medical certification form, and instead gave Hussey a letter dated August 24, 2010 to provide to his employer. In late August 2010, Hussey furnished that letter to Defendant. In her letter, Nurse Martin made the following recommendations for Hussey: "It is recommended that he be permitted to change duties and times to a less stressful situation when needed. It is advised that he may need time to make adjustments

in an environment that is quieter that allows for time to rest and readjust. She concluded in the letter: "Therefore, I am requesting that this worthy veteran's needs be considered when he reports to supervisors that his anxiety and his inability to stay focused is increasing and he may need to leave work before he loses control in specific situations." Between late August and October 2010 Hussey did report to Rogers on one or two occasions that his anxiety was increasing. Hussey admits that when he reported his increased anxiety to Rogers, he told Rogers he needed to step away from his duties. In response, Rogers said, "Okay."

Defendant issued a new certification form to Hussey on August 31, 2010 and requested its completion and return by September 15, 2010. This time, Nurse Martin did complete the medical certification form, which she signed and dated September 8, 2010. In her certification, Nurse Martin stated that when Hussey's PTSD symptoms arose, she suggested that his employer allow him an opportunity "to deescalate in certain times during his work hours [because that] is what he deserves and needs . . . ." When asked in the medical certification whether Hussey's condition would cause episodic flare-ups that would prevent him from performing his job functions, Nurse Martin stated: "PTSD symptoms often present, negative behavior therefore leaving [sic] for short times and/or changing hours are important." At the conclusion of the certification, Nurse Martin was asked in Question 7(d) to estimate the "frequency of flare-ups and the duration of related incapacity" Hussey may have over the next 12 months. In response, Nurse Martin wrote, "NA. Not a concrete time span or limit can be predicted."

Hussey provided the medical certification form to Defendant around September 11, 2010. Upon receipt of the medical certification form, Defendant's Employee Relations Department noted that Question 7(d) pertaining to frequency and duration of flare-ups had not been completed. Thus, Defendant advised Hussey that his certification was deficient, and that his health care provider needed to complete Question 7(d). Defendant then gave Hussey until September 26, 2010 to return the updated certification. Hussey did not provide an updated or additional medical certification form to Defendant from Nurse Martin or any other health care provider.

Concurrent with Hussey's initial disclosure of his PTSD to Rogers in early August 2010, Defendant's Security Department was then experiencing a staffing shortage among its security

officers. Due to the staffing shortage, Security management imposed a requirement in the summer of 2010 for all security officers to work mandatory overtime, which included having officers work on their regularly scheduled days off. Defendant's then-Executive Director of Security, Marty Lehtinen ("Lehtinen"), addressed the situation in a memorandum dated August 2, 2010, and explained that Defendant was in the process of hiring approximately 53 additional security officers. As of August 2010, Defendant had a total of six (6) bike officers working on the graveyard shift, including Hussey. While bike officers did require some additional training, nothing prevented other security officers from being so trained if they so desired and were permitted to do so by Defendant.

Prior to the mandatory overtime directive to all security officers, Hussey had a regular work schedule as a bike security officer from 12:00 a.m. until 8:00 a.m. on the graveyard shift. He worked Monday through Friday, and had Saturdays and Sundays as his regular days off. Between August 24, 2010, the date of Nurse Martin's initial letter, and October 10, 2010, Hussey worked a total of 13 extra days in addition to his regular 5-day work schedule. These extra days primarily consisted of Hussey working on Saturdays and Sundays, what would have been his regular days off. Hussey received overtime pay for the additional time worked.

After the September 26, 2010 deadline passed and Hussey had not furnished any updated medical certification, then-Employee Relations Counselor Luz Cruz-Vitaro ("Cruz-Vitaro") requested a meeting to speak with Hussey. On September 29, 2010, Hussey met with Cruz-Vitaro and Rogers. During that meeting, Hussey stated that he did not want to change shifts from the graveyard. Instead, Hussey said that he needed intermittent FMLA leave. The same day, Hussey confirmed his request for intermittent leave in a written statement. In that statement, he indicated that he did not want to change his work shift. Defendant denied Hussey's request for FMLA intermittent leave on September 30, 2010 and so advised Hussey. He was not asked if he would like an accommodation for intermittent leave. Defendant did reach out to directly to Nurse Martin to ask again if she would provide an estimate on the frequency and duration issue. Nurse Martin did not respond.

Hussey continued to work until October 19, 2010, which would ultimately be the last date he physically appeared for a shift. On that same day, Nurse Martin provided a second letter for Hussey, this time requesting that he be given one (1) week off duty to make an adjustment to his medication because of increased anxiety and near panic attacks. Hussey submitted a vacation leave request for the one (1) week, which Rogers approved. Hussey's vacation leave was approved through October 26, 2010, with him expected back at work on October 27. Hussey, however, did not return to work, and instead called out for October 27, 28 and 29.

On October 27, 2010, Defendant notified Hussey that it would deny his request for FMLA intermittent leave due to deficiencies in the medical certification form. Near that time, Hussey submitted to Defendant a note handwritten by Nurse Martin and dated October 28, 2010 which stated, "Soloman Hussey 8713 can return to work without restrictions on 11.13-10." Following receipt of Nurse Martin's handwritten note of October 28, 2010, Defendant again reached out to Hussey. On November 2, 2010, Cruz-Vitaro spoke with Hussey by telephone and discussed the need for FMLA medical certifications to be completed for his intermittent leave request and his continuous leave request (from October 27 through November 12, 2010). By e-mail of that same date, Defendant provided Hussey with two (2) FMLA medical certification forms to be completed and returned by November 16, 2010. Defendant also sent an Acknowledgment for Hussey to sign, confirming he had received the subject forms. Hussey, despite having signed previous Acknowledgments, refused to sign this one, claiming the date was wrong and should have been dated for August 2010, when he first made his condition known. At some point in early November 2010, Hussey filed a Charge of Discrimination with the EEOC. The EEOC sent a notice of the Charge of Discrimination to Defendant on November 4, 2010.

Hussey testified that on November 13, 2010 he went to Rogers' office and left a letter from Nurse Martin dated November 12, 2010. The letter stated that Hussey had a recent increase of anxiety of work related issues, which would require an increase in his medication. Nurse Martin recommended that Hussey should be given an additional two weeks off of work with consideration of working in another department within the properties.

On November 19, 2010, then-Director of Security Cara Welk ("Welk"), in consultation with Employee Relations, placed Hussey on suspension pending investigation ("SPI") for his failure to return to work/job abandonment. An SPI is categorized in Defendant's Attendance Standards Policy as a temporary status which allows Defendant to investigate the underlying circumstances of employee conduct before taking any additional action. An employee placed on SPI can subsequently be: (1) returned to work with no discipline and paid for any time lost, (2) returned to work with some form of discipline imposed, or (3) terminated. Ms. Welk attempted to call Hussey to advise of the SPI the same day it was issued, but she was unable to reach him and left a message for him to call back. Hussey never called back to speak with either Ms. Welk or anyone else at Defendant for the balance of 2010.

Cruz-Vitaro wrote Hussey a letter dated December 6, 2010 which chronicled the events occurring since August 2010. She also enclosed blank FMLA medical certification forms for him to have completed and returned with 15 days, as well as a Medical Verification Form if he was requesting a reasonable accommodation for disability. Cruz-Vitaro wrote that the authorization to release medical information and the medical verification form must be completed before the ADA interactive process could begin. Hussey did not respond to the December 6, 2010 letter.

On January 13, 2011, counselors from Defendant's Employee Relations department sent a letter to Hussey, requesting to meet with him. Hussey met with then-Employee Relations Counselor Kathleen Bast ("Bast") and Employee Relations Coordinator Gloria Kudla ("Kudla") on January 18, 2011. In that meeting, Bast asked if Hussey was able to return to work. He stated in response that he was not sure, and would have to get back to her. In addition, Hussey claimed in the January 2011 meeting that he informed Bast about leaving a note from Nurse Martin on Supervisor Rogers' desk in November 2010.

After the January 18, 2011 meeting, the only time Hussey spoke with anyone in Employee Relations was when he tendered his resignation in February 2011. Hussey remained off work for all of January and February 2011. He went to Defendant's premises on February 28, 2011 to submit his resignation.

**B. Disputed Fact**

1 | The parties dispute when Defendant first received and reviewed the November 12, 2010 letter from Nurse Martin.

**V.  DISCUSSION**

**A. Laches**

Laches is an equitable defense to "a party's right to bring suit, which is derived from the maxim that those who sleep on their rights, lose them." Eat Right Foods Ltd. v. Whole Foods Mkt., Inc., 880 F.3d 1109, 1115 (9th Cir. 2018) (citation and quotation marks omitted). Whether a plaintiff's claim is barred by laches is a question of law. Miller v. Maxwell's Intern., Inc., 991 F.2d 583, 585 (9th Cir. 1993). However, "[b]ecause the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment." Couveau v. Am. Airlines, Inc., 218 F.3d 1078, 1083 (9th Cir. 2000) (citation omitted).

In employment discrimination suits, an employer may assert the defense of laches to prevent a plaintiff "from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 121 (2002). To prevail on this defense, the employer must prove two elements: (1) a lack of diligence by the plaintiff, and (2) resulting prejudice to the defendant. Id. at 121-22 (citations omitted) (discussing the test in the context of a Title VII hostile work environment action). Where laches is asserted as a defense, the defendant employer must make a prima facie showing of prejudice; if the burden is met, the burden shifts to plaintiff to show either that the employer was not actually prejudiced, or reasonable diligence was exercised in the filing of the complaint. Romans v. Incline Vill. Gen. Improvement Dist., 658 Fed. Appx. 304, 306 (9th Cir. 2016) (quoting United States v. Riedl, 496 F.3d 1003, 1008 (9th Cir. 2007)). When plaintiff offers no "viable justification" for her delay, the first element of the laches test is satisfied. Id. (quoting Danjaq LLC v. Sony Corp., 263 F.3d 942, 955 (9th Cir. 2011)).

There are two forms of prejudice resulting from unreasonable delay – evidentiary and evidence based. Id. at 307 (quoting Danjaq, 263 F.3d at 955)). Evidentiary prejudice may be found

where defendant alleges that evidence has been lost, or there are witnesses whose memories have faded or who have died. Id.

Under the Equal Employment Opportunity Act of 1972, the only time limitation on the right for the EEOC to bring suit is that the EEOC may not pursue litigation until at least 30 days after a Notice of Charges is filed. Occidental Life Ins. Co. of Cal. v. EEOC, 432 U.S. 355, 360 (1977). Aside from that limitation, "neither [Section] 706(f) nor any other section of the Act explicitly requires the EEOC to conclude its conciliation efforts and bring an enforcement suit within any maximum period of time." Id. (analyzing EEOC suit against employer brought three years and two months after the charging party first raised a complaint with the EEOC). "Unlike the litigant in a private action who may first learn of the cause against him upon service of the complaint, the Title VII [or ADA] defendant is alerted to the possibility of an enforcement suit within 10 days after a charge has been filed. This prompt notice serves, as Congress intended, to give him an opportunity to gather and preserve evidence in anticipation of a court action." Id. at 372. Yet, if the evidence demonstrates that the EEOC acted with unreasonable delay, "the federal courts do not lack the power to provide relief. . . . This Court has said that when a Title VII [or ADA] defendant is in fact prejudiced by a private plaintiff's unexcused conduct of a particular case, the trial court may restrict or even deny backpay relief. . . . The same discretionary power to locate a just result in light of the circumstances peculiar to the case . . . can also be exercised when the EEOC is the plaintiff." Id. at 373 (citations and quotation marks omitted).

In its Motion for Summary Judgment, Plaintiff requests summary judgment on Defendant's thirteenth affirmative defense of laches. Plaintiff contends that Defendant cannot show that it suffered substantial prejudice, and that laches should not bar this suit because it was filed in the public interest. Defendant argues that Plaintiff's delay in filing the instant suit was unreasonable, and that Defendant has faced evidentiary prejudice as a result.

The Court finds that summary judgment in Plaintiff's favor is unwarranted, as the Court is required to engage in a highly fact-intensive inquiry to determine whether laches is available to bar a suit. Although the issue is to be decided by the Court, at this stage, there is insufficient evidence for the Court to determine whether Plaintiff's delay was reasonable, or whether

1 Defendant has not been substantially prejudiced. The Court finds that this case presents a
2 somewhat unique factual circumstance, in that nearly all of the decisions taken in relation to
3 Hussey's employment were documented contemporaneously. Defendant's concern that witnesses'
4 memories have faded or that witnesses are no longer in its employ may prove to be minimal given
5 the documentation produced in discovery – however, the Court finds that the final resolution of
6 this issue should be determined after trial. While it appears unlikely that Defendant will be able to
7 establish evidentiary prejudice, the issue requires further facts in the context of trial. The Court
8 therefore denies the Plaintiff's motion on this point.

### B. Qualifications to Perform Essential Job Functions

"To state a claim of discrimination under the ADA, a plaintiff must establish that he or she is a 'qualified individual.'" Rohr v. Salt River Project Agric. Imp. & Power Dist., 555 F.3d 850, 862 (9th Cir. 2009). According to the 2010 regulations implementing the ADA, a "[q]ualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630(m) (2010). The burden of proof to show that she is a qualified individual lies with the plaintiff. See Smith v. Clark Cnty. Sch. Dist., 727 F.3d 950, 957-58 (9th Cir. 2013) ("To prevail on her ADA claim, Smith bears the burden of proving that she is a qualified individual who can perform the essential functions of a particular job."); see also Bates v. United Parcel Serv., Inc., 511 F.3d 974, 990 (9th Cir. 2007) ("As the plaintiff, Bates bears the burden to prove that he is 'qualified.'"). "Essential functions" are the fundamental job duties of the role that an individual with a disability holds or desires. 29 C.F.R. § 1630(n)(1) (2010). The ADA's protections do not apply where a disabled person cannot perform the essential functions of a job, even with a reasonable accommodation. Bates, 511 F.3d at 989 (citation omitted).

Plaintiff moves for summary judgment on the issue of Hussey being a qualified individual under the ADA. In Plaintiff's view, the undisputed facts demonstrate that Hussey had a disability between August 2010 and February 2011; the disability impairs his brain functioning such that it

substantially limits major life activities; and he continued to perform the essential functions of his job even without an accommodation. Defendant argues that Hussey was not a qualified individual because, although it is undisputed that he had a disability, the fact that his medical provider failed to indicate the frequency and duration of Hussey's PTSD flare ups meant that he could become incapacitated at any time and therefore would be unable to perform the essential functions of his job. Defendant further contends that Hussey's requested accommodation of being able to take breaks or leave when needed was unreasonable, as an essential function of his job required him to be physically present at work.

The Court finds that there is a genuine dispute of fact as to the issue of whether Hussey could perform the essential functions of the bike security officer job from the time he disclosed his diagnosis to the time he resigned from Defendant's employ. The undisputed facts clearly demonstrate that Hussey had PTSD as of August 2010, when he disclosed this condition to his supervisor; the parties do not dispute that Hussey had a disability. However, a reasonable juror could find that Hussey was not qualified to perform the essential functions of the job, which required consistent in-person attendance. On the other hand, a reasonable juror could find that Hussey was qualified to perform the job if he received a reasonable accommodation, such as removing overtime shifts from his work schedule. Because there are disputes of fact as to the provision of a reasonable accommodation, and because that inquiry is inextricably linked to the issue of whether Hussey was a qualified individual, the Court finds that it cannot resolve this dispute at this stage.

For these reasons, summary judgment is unwarranted in favor of either party.

**C. Engaging in the Interactive Process in Good Faith**

In the Ninth Circuit, employers and employees alike are required to engage in an "interactive process" in making reasonable accommodations for disabled employees, as "the interactive process is a mandatory rather than a permissive obligation on the part of employers under the ADA . . . ." Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000), vacated on other grounds by U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002). The employee need not use the words "reasonable accommodation" to trigger the start of the interactive process, and in some

instances, an employer should automatically begin the process even when an employee has not requested an accommodation where the employer "(1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation." Id. at 1112 (quotation marks omitted) (quoting EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Compliance Manual (CCH), § 902, No. 915.002 (March 1, 1999), at 5459).

"The interactive process requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002) (citation omitted). Both the employer and the employee must engage in the interactive process in good faith. "[T]he employee's participation is equally important because he or she generally knows more about his or her capabilities, and holds essential information for the assessment of the type of reasonable accommodation which would be most effective." Goos v. Shell Oil Co., 451 Fed. Appx. 700, 702 (9th Cir. 2011) (quotations omitted). As a part of the interactive process, "[e]mployers should meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." Id. at 1115 (citations omitted).

The Ninth Circuit has granted summary judgment for employers where employees failed to engage in the interactive process. See, e.g., Dep't of Fair Employment & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 743 (9th Cir. 2011) (finding that the undisputed facts demonstrated that the failure of the interactive process was caused entirely by the employee); Allen v. Pac. Bell, 348 F.3d 1113, 1115 (9th Cir. 2003) ("Because Allen was requested, but failed, to submit additional medical evidence that would serve to modify his doctor's prior report, Pacific Bell's determination

. . . was appropriate. Pacific Bell did not have a duty under the ADA or California law to engage in further interactive processes . . . in the absence of any such information.").

The reasonableness of an accommodation, and whether it is an undue burden, is generally a question of fact. Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001) (citations and quotation marks omitted). "Determining whether a proposed accommodation . . . is reasonable, including whether it imposes an undue hardship on the employer, requires a fact-specific, individualized inquiry. In the summary judgment context, a court should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation." Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999) (finding a dispute of material fact as to whether medical leave constituted a reasonable accommodation). An accommodation need only be reasonable on its face. Dark v. Curry Cty., 451 F.3d 1078, 1088 (9th Cir. 2006).

Under the regulations implementing the ADA, the term "reasonable accommodation" is defined to mean, in relevant part: "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position[.]" 29 C.F.R. § 1630.2(o)(ii) (2010). The Ninth Circuit has held that "[a]n ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations. Ineffective modifications therefore are not accommodations." U.S. E.E.O.C. v. UPS Supply Chain Sols., 620 F.3d 1103, 1110 (9th Cir. 2010) (quotations omitted). "Reasonable accommodations may include: 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations.'" Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 803 (1999) (citing 42 U.S.C. § 12111(9)(B)). Notably, "[a]n employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." UPS Supply Chain Sols., 620 F.3d at 1110-11 (citation omitted).

Congress did not intend for the FMLA to modify the rights available under the ADA. 29 C.F.R. § 825.702(a) (2010). Even if an employee requests FMLA leave, if the employee meets the definition of a "qualified individual" under the ADA, the employer is required to make reasonable accommodations unless the employer would face an undue hardship. 29 C.F.R. § 825.702(b) (2010).

Defendant argues in its Motion that it engaged in the interactive process in good faith. Defendant's position is that Hussey was responsible for the breakdown in the interactive process, as he failed to complete all parts of the certification form, did not independently request any other accommodation besides intermittent leave, and did not communicate with Defendant for several months despite Employer Relations personnel initiating contact. Plaintiff seeks summary judgment on the issue of Defendant's failure to accommodate Hussey. Plaintiff contends that the requirement to engage in the interactive process was triggered immediately when Defendant became aware of Hussey's need for accommodation in August 2010, when Rogers advised Hussey to fill out FMLA forms, and also when Nurse Martin provided the August 24, 2010 letter detailing Hussey's PTSD condition; yet, Defendant only considered Hussey's request under the FMLA. Plaintiff further argues that Defendant disregarded the other suggestions for accommodation provided by Nurse Martin, such that Defendant caused the breakdown in the interactive process.

The Court finds that there are genuine issues of fact regarding the interactive process and potential reasonable accommodations that must be left to the jury. With regard to Defendant, the Ninth Circuit has held that "summary judgment is available only when there is no dispute that the employer has engaged in the interactive process in good faith." Barnett, 228 F.3d at 1116. The Court finds that there are disputes of fact as to whether the Defendant engaged in the interactive process in good faith as the parties dispute, *inter alia*, whether Defendant's insistence on a prediction of symptom flare-ups constituted good faith.

Moreover, there is a dispute as to whether Hussey's request was considered under the ADA, or whether it was simply treated as an FMLA request. There is a dispute of fact as to whether any of the Employee Relations representatives specifically asked Hussey about his needs and limitations and what he thought potential accommodations could be, during the meetings with

Hussey. Although Defendant contends that it provided Hussey with ADA-related forms at a certain point during his absence, there remains a triable issue for the jury as to whether a clear dialogue between Defendant's representatives and Hussey took place that fulfilled the requirements of the interactive process. FMLA intermittent leave was just one potential accommodation proposed by Hussey and his provider. There is a genuine dispute as to whether the interactive process took place between Hussey and Defendant such that an alternative reasonable accommodation could have been agreed upon – or was actually provided – in light of Defendant's scheduling difficulties and Hussey's needs to minimize his flare ups.

### D. Retaliation

42 U.S.C. § 12203(a) (2010) prohibits the discrimination against any individual for filing a charge or participating in an investigation under the ADA. The Ninth Circuit applies the McDonnell Douglas burden-shifting test to ADA retaliation claims. Curley v. City of North Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014) (citations omitted); see also Brown v. City of Tucson, 336 F.3d 1181, 1186-87 (9th Cir. 2003). To establish a prima facie case for retaliation, a plaintiff must show: "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." Brown, 336 F.3d at 1187 (citations and quotation marks omitted). The burden then shifts to the employer to articulate a legitimate reason for the employment action. Id. If the employer meets its burden, the Plaintiff must produce evidence that the proffered reason is pretextual. Id. A showing of but-for causation is required for the "causal link" element of the retaliation test. T.B. ex rel. Brenneise v. San Diego Unified School Dist., 806 F.3d 451, 473 (9th Cir. 2015) (citing University of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013)).

"The EEOC has interpreted 'adverse employment action' to mean 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'" Ray v. Henderson, 217 F.3d 1234, 1242-43 (9th Cir. 2000). "The EEOC test covers lateral transfers, unfavorable job references, and changes in work schedules. These actions are all reasonably likely to deter employees from engaging in protected activity." Id. at 1243; see also Ramsey v. City of Philomath, 182 Fed. Appx. 678, 680 (9th Cir.

2006) ("Ramsey has also shown that she suffered adverse employment actions of transfer, reduction in work hours, and dismissal.").

Whether an adverse employment action is retaliatory is a question of fact. Ellins v. City of Sierra Madre, 710 F.3d 1049, 1062 (9th Cir. 2013) (citation omitted) (applying rule in First Amendment retaliation context).

Defendant argues that it did not retaliate against Hussey for filing the Charge of Discrimination. Defendant also argues that Hussey was not assessed any attendance points, contrary to what Defendant's Attendance Standards Policy requires, and essentially received de facto intermittent leave which cannot be considered an adverse action. Along those lines, Defendant contends that Plaintiff cannot establish a "but for" causal link between Hussey's protected activities and the SPI, as the SPI was not disciplinary. Plaintiff counters that summary judgment is unwarranted because there is a triable issue as to whether the SPI was a retaliatory adverse employment action; Plaintiff argues that it has met the prima facie test and that a reasonable juror could infer retaliation given the close proximity in time between the filing of the Charge and the SPI. Plaintiff contends that the SPI, which resulted in unpaid leave, was unnecessary when Defendant was aware of the reason for Plaintiff's absence.

The Court finds that there is a genuine dispute of fact as to whether the SPI amounted to a retaliatory adverse employment action. A reasonable juror could find that Plaintiff was placed on the SPI because he filed the Charge of Discrimination, and the temporal proximity may suggest retaliatory intent. Because the Court is not in the position of resolving factual disputes at the summary judgment stage, the retaliation issue must be left to the jury.

### E. Punitive Damages

Plaintiff requests summary judgment against Defendant's third affirmative defense, regarding the constitutionality of a claim for punitive damages. The Court interprets this defense as Defendant reserving the right to challenge the evidence upon which punitive damages are based, or the amount of punitive damages if awarded, under the due processes clauses of the U.S. Constitution and Nevada Constitution. Because there has not yet been a determination that punitive damages are warranted in this case; the Court denies the Plaintiff's request as premature.

## VI. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 26) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff's Partial Motion for Summary Judgment (ECF No. 27) is DENIED.

**IT IS FURTHER ORDERED** that the parties submit a Proposed Joint Pretrial Order by August 31, 2018.

**IT IS FURTHER ORDERED** that the parties are referred to the Magistrate Judge for the purposes of scheduling a settlement conference.

DATED: July 10, 2018.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**